UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Joseph Taillon

     v.                             Case No. 11-cv-470-SM
                                           Opinion No. 2013 DNH 073

United States of America

## O R D E R

Petitioner was convicted, based on his guilty pleas, of four offenses involving racketeering and fraud.[1]  He was sentenced to 168 months of imprisonment on each conviction, to run concurrently, and was ordered to pay special assessments and restitution.  Petitioner seeks relief from his convictions and sentences under 28 U.S.C. § 2255.

### Standard of Review

Section 2255 provides relief "only when the petitioner has demonstrated that his sentence (1) was imposed in violation of the Constitution, or (2) was imposed by a court that lacked jurisdiction, or (3) exceeded the statutory maximum, or (4) was otherwise subject to collateral attack."  Moreno-Morales v.

---

[1]  Specifically, petitioner was convicted of violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); conspiracy to violate RICO, § 1962(d); conspiracy to commit wire fraud in violation of 18 U.S.C. § 371 and 18 U.S.C. § 1343; and conspiracy to commit mail fraud in violation of § 371 and 18 U.S.C. § 1341.

<u>United States</u>, 334 F.3d 140, 148 (1st Cir. 2003) (internal
quotation marks omitted).  The fourth category "includes only
assignments of error that reveal fundamental defects which, if
uncorrected, will result in a complete miscarriage of justice, or
irregularities that are inconsistent with the rudimentary demands
of fair procedure."  <u>Id</u>.  The petitioner bears the burden of
showing that he is entitled to relief.  <u>David v. United States</u>,
134 F.3d 470, 474 (1st Cir. 1998).

## Background

On October 7, 2002, petitioner, along with fifteen others,
was indicted on charges of RICO violations and conspiracy to
commit wire and mail fraud, related to an organized and
widespread telemarketing scheme operated out of Canada and aimed
at defrauding gullible and vulnerable people, including United
States citizens.  <u>United States v. Taillon</u>, 02-cr-153-SM (D.N.H.
Oct. 7, 2002).  A superseding indictment was filed on September
8, 2004.  Most of petitioner's codefendants had already pled
guilty by the end of 2008.

The government also brought a civil forfeiture proceeding
against funds linked to the telemarketing scheme — funds that had
been seized from the accounts of certain banks, including the
Union Bank for Savings and Investment of Jordan.  <u>United States</u>

2

v. Bank of New York 7173, 02-cv-472-PB (D.N.H. Oct. 18, 2002).
Union Bank was represented in that forfeiture proceeding by
attorneys associated with the firm of Orr & Reno, P.A.  That fact
is noteworthy, because later on petitioner was also represented
by an attorney associated with Orr & Reno.

The government initially seized $2,343,905.33 from Union
Bank's U.S. interbank account, held at the Bank of New York.
Approximately a year later, it seized an additional $501,228.18
from the same account.  United States v. Union Bank for Savings &
Investment (Jordan), 487 F.3d 8, 11 (1st Cir. 2007).  After
$30,000.00 was released, the total seizure amounted to more than
$2.8 million.  Id.  The government alleged in the civil
forfeiture action that the funds seized consisted of "proceeds of
a Canadian telemarketing fraud scheme that victimized American
citizens."  Id.  The perpetrators of the fraud, alleged to be
petitioner and his codefendants, told their victims that they had
won large Canadian sweepstakes or lottery prizes, but that they
had to send cashier's checks in varying amounts to post office
boxes in Montreal to cover expenses associated with delivering
those prizes.  Id.

The perpetrators of the fraud then sold the cashier's checks
obtained from victims, and those checks eventually were resold to

a money exchange business in East Jerusalem, Israel, operated by
the Esseileh family.  Id. at 11-12.  The checks were then
deposited into accounts held by an Esseileh family member at
Union Bank.  Id. at 12.  Union Bank transmitted the checks to its
U.S. interbank account at the Bank of New York, and the Bank of
New York presented the checks to the issuing banks for payment,
crediting Union Bank's account with the funds obtained.  Id.
When the issuing banks did not attempt to reverse payment on any
of the checks, the credit in the Union Bank account became final.
Id.


     Union Bank appeared in the forfeiture action and filed a
claim to the funds seized from its U.S. interbank account at the
Bank of New York.  Id. at 13.  In support of its claim, Union
Bank argued that it was "an innocent owner of the [seized]
funds," and so was entitled to recover.  Id.  The government
countered that Union Bank was not an owner of the funds at all,
and lacked both standing and any statutory basis upon which to
challenge the forfeiture.  Id.  The district court concluded that
Union Bank was not the owner, for purposes of forfeiture, of $2.1
million of the seized funds, which left approximately $660,000 in
dispute.  Id. at 14.  After the parties settled some disputed
issues, Union Bank appealed the ruling that it was not the owner
of $2.1 million of the seized funds, and the government cross-

appealed the disposition of $80,000, which the parties agreed
depended on whether Union Bank was the owner of those funds.  Id.

The Court of Appeals for the First Circuit concluded that
the Esseilehs, not Union Bank, owned the funds at the time of the
seizure.  Id. at 18-22.  Therefore, Union Bank was not the owner
of any of the seized funds, and did "not have the statutory right
to assert an innocent owner defense to the forfeiture."  Id. at
22.  Judgment was entered in the civil forfeiture case on July
25, 2007.

Much earlier, petitioner had been arrested in Canada, but he
was released pending extradition proceedings.  He failed to
appear at an extradition hearing on October 26, 2003, and fled
from Canada.  He was eventually found and arrested in France, on
November 4, 2007.  And, he was finally extradited to the United
States in December of 2009 to face the described criminal
charges.  On December 14, 2009, Attorney Robert S. Carey, of Orr
& Reno, P.A., was appointed to represent petitioner, and he was
arraigned on the superseding indictment.

On October 7, 2010, petitioner pled guilty to Counts 1, 2,
3, and 8 of the indictment, pursuant to a written plea agreement
with the government.  He was sentenced to 168 months of

imprisonment as to each count, to be served concurrently, and three years of supervised release.  He was ordered to pay a special assessment of $400.00 and restitution in the amount of $1,791,859.25.

## Discussion

Petitioner seeks habeas relief, asserting claims of ineffective assistance of counsel and prosecutorial misconduct. Specifically, he contends that his appointed counsel had a conflict of interest and provided ineffective assistance with respect to sentencing.  He also contends that the prosecutors' failure to inform him that his counsel's law firm previously represented Union Bank in the civil forfeiture proceeding constituted misconduct.  The government responds that petitioner's counsel did not have a conflict of interest; that even if a conflict did exist, petitioner was not prejudiced; and that no prosecutorial misconduct occurred.

A.   <u>Hearing</u>

If a petition for relief under § 2255 is not dismissed at the outset, a court will review the government's response and any other pertinent materials to determine whether an evidentiary hearing is necessary.  Rules Governing § 2255 Proceedings, Rule 8(a).  "Evidentiary hearings on § 2255 motions are the exception,

not the norm, and there is a heavy burden on the petitioner to demonstrate that an evidentiary hearing is warranted." <u>Moreno-Morales</u>, 334 F.3d at 145.  A petition under § 2255 may be decided without a hearing "as to those allegations which, if accepted as true, entitle the movant to no relief, or which need not be accepted as true because they state conclusions instead of facts, contradict the record, or are inherently incredible." <u>United States v. McGill</u>, 11 F.3d 223, 226 (1st Cir. 1993); <u>accord</u> <u>Moreno-Espada v. United States</u>, 666 F.3d 60, 66-67 (1st Cir. 2012).

In this case, as discussed below, the record shows that petitioner is not entitled to relief on his petition.  Therefore, an evidentiary hearing is not necessary.

B.    <u>Conflict of Interest</u>

Petitioner asserts that his legal counsel had a clear conflict of interest, because lawyers from the same firm, Orr and Reno, P.A., had previously represented Union Bank, an ostensible victim of his crimes, in the civil forfeiture proceeding.  He argues that his guilty pleas were involuntary and improvident because he relied on the advice of conflicted counsel.  The government responds that no conflict of interest existed and

that, even if a conflict is identified, petitioner cannot show any resulting prejudice.

The Sixth Amendment guarantees criminal defendants effective assistance of counsel.  <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984).  Absent a valid waiver, effective assistance includes conflict-free counsel.  <u>Mountjoy v. Warden</u>, 245 F.3d 31, 36 (1st Cir. 2001).

To succeed on an ineffective assistance of counsel claim, a habeas petitioner "must demonstrate both: (1) that 'counsel's performance was deficient,' meaning that 'counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment'; and (2) 'that the deficient performance prejudiced the defense.'"  <u>United States v. Valerio</u>, 676 F.3d 237, 246 (1st Cir. 2012) (quoting <u>Strickland</u>, 466 U.S. at 687).  The prejudice element is relaxed, however, if the petitioner "'demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance.'"  <u>Yeboah-Sefah v. Ficco</u>, 556 F.3d 53, 73 (1st Cir. 2009) (quoting <u>Strickland</u>, 466 U.S. at 692-94) (additional citation omitted).

1.   <u>Conflict</u>

Conflict of interest issues have arisen in a variety of situations.  In <u>Holloway v. Arkansas</u>, 435 U.S. 475 (1978), for example, defense counsel was appointed to represent three codefendants, but objected to joint representation on the ground that he could not provide adequate representation to all three. <u>Id</u>. at 478-80.  The trial court denied counsel's motion for appointment of separate counsel.  <u>Id</u>. at 478-79.  The Supreme Court presumed that counsel's conflicting interests "undermined the adversarial process . . . [which] was justified because joint representation of conflicting interests is inherently suspect, and because counsel's conflicting obligations to multiple defendants 'effectively sea[l] his lips on crucial matters' and make it difficult to measure the precise harm arising from counsel's errors."  <u>Mickens v. Taylor</u>, 535 U.S. 162, 168 (2002) (quoting <u>Holloway</u>, 435 U.S. at 489-90).  The Court concluded that joint representation of conflicting interests required reversal without a showing of resulting prejudice.  <u>Holloway</u>, 435 U.S. at 490-91.


In <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 347-48 (1980), counsel represented three defendants who were tried in separate proceedings for murder.  No objection was made to the multiple representation.  The Supreme Court held that the automatic

reversal rule applied in <u>Holloway</u> did not extend to the
circumstances in <u>Cuyler</u>.  <u>Mickens</u>, 535 U.S. at 168.  Instead, the
defendant would be required to show "that 'a conflict of interest
actually affected the adequacy of his representation.'"  <u>Id</u>.
(quoting <u>Cuyler</u>, 446 U.S. at 348-49).  Further, a trial court is
obligated to inquire into "the propriety of a multiple
representation . . . only when 'the trial court knows or
reasonably should know that a particular conflict exists,' . . .
which is not to be confused with when the trial court is aware of
a vague, unspecified possibility of conflict, such as that which
'inheres in almost every instance of multiple representation.'"
<u>Mickens</u>, 535 U.S. 168-69 (quoting <u>Cuyler</u>, 446 U.S. at 347-48).


    In <u>Mickens</u>, the defendant was accused of murder and was
represented by appointed counsel.  <u>Mickens v. Taylor</u>, 535 U.S.
182, 165 (2002).  Before being appointed to represent Mickens,
however, counsel had represented the murder victim.  <u>Id</u>.  Mickens
argued, relying on <u>Wood v. Georgia</u>, 450 U.S. 261 (1981), that a
defendant need only show that his counsel "was subject to a
conflict of interest" to obtain reversal of a judgment and "need
not show that the conflict adversely affected counsel's
performance."  <u>Mickens</u>, 535 U.S. at 170-71.  The Supreme Court
explained that an "actual conflict of interest," as the phrase
was used in <u>Wood</u>, meant a conflict that adversely affected

counsel's representation. <u>Mickens</u>, 535 U.S. at 171. Absent that showing, no relief was available. <u>Id</u>. at 173-74.

No actual or potential conflict of interest issue was raised in petitioner's underlying criminal case. Petitioner has not shown any plausible ground upon which it might be argued that the court knew or should have known of a potential conflict of interest in his criminal case arising from the earlier civil forfeiture proceeding. Therefore, no duty to inquire into the propriety of multiple representation (that is, Orr & Reno, P.A.'s representation of Union Bank and petitioner) arose in the criminal matter. The automatic reversal rule adopted in <u>Holloway</u>, then, does not apply here.

Petitioner contends that his counsel had a conflict of interest like the conflict in <u>Brien v. United States</u>, 695 F.2d 10 (1st Cir. 1982). In that case, Brien and Abrahams were officers of a commodities trading firm. Both were indicted on charges of fraud and conspiracy to commit wire and mail fraud, based on their involvement in the firm. <u>Id</u>. at 11. They were represented initially by lawyers from the same law firm and then by the same lawyer. <u>Id</u>. Both were convicted. <u>Id</u>. at 12.

Brien filed a petition for habeas corpus relief, asserting ineffective assistance of counsel due to a conflict of interest. Brien argued that the trial judge should have warned him of the dangers of multiple or joint representation.  Id. at 12-13.  The petition was denied by the district court, and that ruling was affirmed on appeal, because Brien had not shown an actual conflict of interest.  Id. at 15-16.

The circumstances here are even less compelling than in Brien.  Petitioner's counsel was not jointly representing another defendant in the same criminal case, nor did any other lawyer from the Orr and Reno firm represent another defendant. Therefore, no joint or multiple representation occurred.  Rather, two different lawyers from the Orr and Reno firm previously represented Union Bank in a civil forfeiture proceeding.  The forfeiture proceeding concluded before petitioner was arraigned, so the representations plainly were not concurrent.[2]  And, petitioner has not shown that any issues in the civil forfeiture proceeding were related to his defense (or sentencing) in the criminal case, at least not in a manner that would create a conflict.

---

[2]  The forfeiture proceeding concluded when judgment was entered on July 25, 2007.  Petitioner's counsel was appointed to represent him in the criminal case more than two years later, on December 14, 2009.

Nevertheless, petitioner asserts that the relationship between the forfeiture proceeding and the criminal case created conflicting interests for his counsel.  He notes that Union Bank was mentioned in the indictment.  He also asserts that Union Bank was a "victim" of the telemarketing fraud because Union Bank unsuccessfully asserted an "innocent owner defense" in the forfeiture proceeding.  Union Bank, however, was neither a defendant in the criminal case, nor was it a victim of the fraud perpetrated by petitioner and his codefendants, except perhaps in a very indirect sense — having more to do with its banking relationship with the Esseileh family and the effects of foreign banking regulations.  But, it was the Esseilehs that suffered loss due to petitioner's fraud.  It has been established that the seized funds did not belong to Union Bank — it lost nothing to which it was entitled.  To the extent it paid the Esseileh family on deposited checks fraudulently obtained by petitioner and his co-conspirators, its recourse was against the depositers' accounts or the depositors themselves.  There has been no action brought by Union Bank against petitioner, nor is one likely, and there was no identified pressure on petitioner's counsel to do, or refrain from doing, anything in his case because of some effect it might have on Union Bank — as noted, the Bank's forfeiture issues were resolved long before petitioner was arraigned.

2.   <u>Prejudice</u>

Even if petitioner could show that his counsel represented him while under some cognizable conflict of interest, which he has not done, he would still have to show an adverse effect, or prejudice.  "'[D]efects in assistance [of counsel] that have no probable effect upon the trial's outcome do not establish a constitutional violation.'"  <u>United States v. DeCologero</u>, 530 F.3d 36, 76 (1st Cir. 2008) (quoting <u>Mickens</u>, 535 U.S. at 166).  To show prejudice for purposes of an ineffective assistance of counsel claim, a petitioner must "show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." <u>Hill v. Lockhart</u>, 474 U.S. 52, 59 (1985).

The prejudice standard is relaxed when ineffective assistance is based on an actual conflict of interest.[3] <u>DeCologero</u>, 530 F.3d at 76-77.  "'[A] mere theoretical division of loyalties' is not itself . . . 'an actual conflict of interest.'"  <u>Yeboah-Sefah</u>, 556 F.3d at 73 (quoting <u>Mickens</u>, 535 U.S. at 171).  To show an actual conflict of interest, a petitioner must establish that counsel's conflict adversely affected his performance "by showing that the attorney might

---

[3]   It remains an open question as to whether the actual conflict standard applies in the circumstance of successive representation.  <u>DeCologero</u>, 530 F.3d at 77 n.24.

plausibly have pursued an alternative defense strategy, and that the alternative strategy was in conflict with, or may not have been pursued because of, the attorney's other loyalties or interests." DeCologero, 530 F.3d at 76-77 (internal quotation marks and citation omitted).

Petitioner argues here that his counsel's representation was adversely affected because counsel advised him to accept a plea agreement that included an 18 point enhancement under the Sentencing Guidelines based on the calculated loss amount resulting from his fraudulent scheme (which exceeded $2,500,000). Petitioner asserts that the loss amount was incorrect, because the government had already recovered $4.5 million of the funds through civil forfeitures.  He contends that the loss amount was not more than $2,500,000, and that his counsel erroneously advised him to accept the plea agreement, presumably because that somehow benefitted, or might have benefitted Union Bank.

The loss amount relevant for sentencing under U.S.S.G. § 2B1.1(b)(1) is deemed to be the greater of the actual or the intended pecuniary loss caused by the defendant.  U.S.S.G. § 2B1.1 cmt. n.3(A); United States v. Appolon, 695 F.3d 44, 66 (1st Cir. 2012); United States v. Volynskiy, 431 Fed. Appx. 8, 10 (2d Cir. 2011).  Loss, under § 2B1.1(b)(1), is not reduced by amounts

later recovered through restitution or forfeiture.  U.S.S.G.
§ 2B1.1 cmt. n.3(E).  The amount forfeited from Union Bank's
accounts, alone, exceeded $2,500,000, and the total loss from the
scheme was of course well in excess of that amount, and well
within the applied loss range under the Guidelines.[4]

Petitioner certainly has not shown an error in the
calculation of the loss amount for Guidelines purposes, and does
not explain how Orr & Reno's representation of Union Bank in the
earlier civil forfeiture proceeding might have influenced his
counsel's advice to plead guilty pursuant to the accepted plea
agreement.  As a result, petitioner has not shown that his
counsel's representation was adversely affected by any alleged
conflict of interest.

As the government points out, the money recovered through
forfeiture from Union Bank actually reduced the amount of
restitution owed by petitioner and his codefendants.[5]  The

---

[4]   In addition, judgments against codefendants David
Johnson, Nelson Azevedo, Sylvia Farmer, and Norman Redler, which
were entered before substantial amounts were recovered through
forfeiture, imposed $6,435,149.39 in restitution.  The plea
agreement for codefendant Joyce Goodlin states the loss, for
purposes of § 2B1.1(b), as more than $2,500,000 and less than
$7,000,000, which is consistent with the loss referenced in
petitioner's own plea agreement.

[5]   In his reply, petitioner characterizes that information
as Brady material.  See Brady v. Maryland, 373 U.S. 83 (1963).

16

government also argues that the similarity of the plea agreements
reached with two of petitioner's codefendants shows that
petitioner's counsel's representation was not adversely
affected.[6]  The government also notes the favorable provisions of
petitioner's plea agreement, including the government's agreement
not to oppose an adjustment for acceptance of responsibility,
which certainly could have been opposed, given petitioner's
flight from Canada to evade extradition and prosecution.

Petitioner's assumption appears to be based on a
misunderstanding.  Brady information is undisclosed evidence
favorable to the defendant that is "'material either to guilt or
to punishment.'"  United States v. Mills, 710 F.3d 5, 11 (1st
Cir. 2013).  While the funds recovered through forfeiture
decreased the amount of restitution owed by the defendants,
including petitioner, the amount of recovered funds were not
material to defendant's guilt nor to the proper calculation of
his Guideline sentencing range.  See, e.g., United States v.
Taillon, 02-cr-153, dkt. no. 347, filed April 30, 2007.
Petitioner has not shown that the amounts of forfeited funds were
either undisclosed or that any information was withheld from him.
Instead, the record shows that the recovered funds were never a
secret, as is apparent from the published opinion in Union Bank,
487 F.3d at 14.

[6]  Petitioner characterizes the government's statement that
two of his codefendants were leaders of the scheme who received
the same plea agreement terms as another Brady violation.  First,
petitioner has not shown that the terms of his codefendants' plea
agreements were withheld from him.  Second, he is mistaken about
the effect of that information.  He contends that if the other
defendants were leaders then he was not a leader of the scheme,
as the government represented him to be.  Contrary to
petitioner's view, the offense level increase under U.S.S.G.
§ 3B1.1(a) applies to "an organizer or leader of a criminal
activity that involved five or more participants or was otherwise
extensive."  There can be more than one leader or organizer of
criminal activity, and petitioner was clearly one.  See Appolon,
695 F.3d at 70-71.

In summary, petitioner has not alleged factual grounds sufficient to show that his counsel either had an actual conflict of interest or that any conflict adversely affected his representation of petitioner.  The record shows that petitioner is not entitled to relief based on his ineffective assistance of counsel claim.

C.  <u>Prosecutorial Misconduct</u>

Petitioner asserts that the government suppressed the fact that counsel from Orr & Reno represented Union Bank in the civil forfeiture proceeding, and thereby engaged in prosecutorial misconduct.  The government does have a general duty "to alert the court to defense counsel's potential and actual conflicts of interest."  <u>United States v. McKeighan</u>, 685 F.3d 956, 966 (10th Cir. 2012).  However, "[p]rosecutorial misconduct is only a ground for § 2255 relief if it violates petitioner's due process rights, . . . that is, if the conduct so infected the [proceeding] with unfairness as to make the resulting conviction a denial of due process."  <u>Moreno-Morales</u>, 334 F.3d at 148.

The record in this case does not support petitioner's claim that his counsel represented him while under a conflict of interest.  The government had no duty to report a potential conflict of interest under these circumstances, and, had the

18

government raised the issue, no conflict would have been found to exist.  In these circumstances, then, it is not necessary to decide whether the government's failure to report a potential or actual conflict of interest to the court could constitute a violation of the defendant's due process rights.  The record here does not support petitioner's claim of prosecutorial misconduct.


D.   Certificate of Appealability

     "Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from . . . the final order in a proceeding under section 2255." 28 U.S.C. § 2253(c)(1).  "A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right."


     If the petition was denied on the merits of its constitutional claims, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 485 (2000).  When the district court denies a petition for habeas relief on procedural grounds alone, "the petitioner seeking a COA must show both that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that

jurists of reason would find it debatable whether the district court was correct in its procedural ruling." <u>Gonzalez v. Thaler</u>, 132 S. Ct. 641, 648 (2012) (internal quotation marks omitted).

In this case, petitioner's claim of ineffective assistance of counsel due to counsel having had a conflict of interest is not supported by the record.  It appears unlikely that reasonable jurists would find the conflict of interest issue debatable or wrongly decided.  Therefore, petitioner has not shown grounds for issuing a certificate of appealability.

### Conclusion

The petition is denied.  The court declines to issue a certificate of appealability, but petitioner may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 2.  <u>See</u> Rule 11, Federal Rules Section 2255 Proceedings.

The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

May 15, 2013

cc:  Joseph Taillon, pro se
     Donald A. Feith, AUSA